UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BENJAMIN EVERSON,

                          Plaintiff,

      -against-

NEW YORK CITY TRANSIT AUTHORITY
and THOMAS CALANDRELLA

                        Defendants.
------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
CV- 02-1121 (ENV)(JMA)

APPEARANCES:

    Rick Ostrove
    Steven Friedman
    Leeds, Morelli & Brown, P.C.
    One Old Country Road, Suite 347
    Carle Place, New York 11514
    *Attorneys for Plaintiff*

    Robert Kenneth Drinan
    New York City Transit Authority
    130 Livingston Street, Room 1243s
    Brooklyn, NY 11201
    *Attorney for Defendants*

**AZRACK, United States Magistrate Judge:**

        Plaintiff Benjamin Everson brings this action against his former employer, the New York

City Transit Authority ("NYCTA"), and his former supervisor, Thomas Calandrella, alleging they

discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act

of 1964; 42 U.S.C. §§ 1981, 1983; the New York State Human Rights Law, N.Y. Exec. Law §

290 et seq. (McKinney 2005); and the New York City Administrative Code, N.Y.C. Admin. Code

§ 8-107 (2005). More specifically, plaintiff claims that defendants failed to promote him because

of his race, subjected him to a hostile work environment, and unlawfully retaliated against him for his participation in protected activities.

On May 1, 2002, the defendants moved to dismiss portions of plaintiff's complaint. Everson v. New York City Transit Auth., 216 F. Supp. 2d 71, 73 (2002). Judge I. Leo Glasser, then assigned to the case,[1] granted the motion in part, dismissing any claims that were predicated on the decision to deny plaintiff a promotion in 1995 and 1996. Everson, 216 F. Supp. 2d at 79. Judge Glasser's decision left plaintiff's failure to promote claim based on four occurrences.

By motion dated January 28, 2005, the defendants moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Judge Eric N. Vitaliano referred defendants' motion for summary judgment to me for a report and recommendation by order dated April 6, 2006. Viewing the evidence in a light most favorable to the movant, I find that there are no material facts in dispute with which a reasonable jury could find that plaintiff was discriminated against on the basis of his race in violation of Title VII, New York Human Rights Law or the New York Administrative Code. I further find that plaintiff failed to establish, as a matter of law, that he was subject to a hostile work environment, or that defendant NYCTA violated his rights under Sections 1983 or 1981. I have found, however, that a material fact remains as to whether plaintiff was retaliated against for engaging in the protected activity of filing a discrimination claim. Accordingly, I recommend that defendants' motion for summary judgment be granted as to all claims except plaintiff's retaliation claim.

---

[1]On September 10, 2004 the case was reassigned to the Judge Dora Lizette Irizarry. It was subsequently reassigned to the Judge Eric N. Vitaliano on April 14, 2006.

# I. FACTS

Benjamin Everson is an African-American male who was employed by the New York City Transit Authority (hereinafter "NYCTA") Division of Track from June 1970 until his retirement in December 2002. (Defs.' 56.1 Stmt. ¶ 2). Plaintiff worked in the Track Division throughout his entire career, where he was promoted to Foreman in 1977, Assistant Supervisor in March 1984, Deputy Superintendent in September 1984, Superintendent in 1986, and General Superintendent in 1992. (Defs.' 56.1 Stmt. ¶¶ 13, 20-24). In each division of the NYCTA at this time, the career path was from General Superintendent, a position the plaintiff had obtained in the Track Division in 1992, to Assistant Chief, to Chief of the division. (Id., ¶ 32.)

Despite what plaintiff alleges to be an "exemplary work record," (Compl. ¶ 9,) he was denied promotions on four occasions, with the promotion going to a white male each time. (Compl. ¶¶ 9, 10). Specifically, the facts show that:

1. On September 18, 1998, plaintiff applied for the Assistant Chief Track Officer position in the Track Division, but the position was given to Ralph DellaMonica, a white male. (Id., ¶ 11(f)). Plaintiff alleges that DellaMonica had less experience and seniority than he had at the time of the hiring, and that he previously assisted in the training of DellaMonica. (Id.)

2. On May 26, 1999, plaintiff applied for an Assistant Chief Infrastructure Officer position in the Division of Infrastructure, but the position was given to Frank Gaetano, a white male whom plaintiff alleges had less experience and seniority than he had at the time of the hiring. (Id., ¶ 11(g)).

3. On November 19, 1999, plaintiff applied for an Assistant Chief Electrical Officer

position in the Electrical Division, but the position was given to Richard Curcio, a white male whom the plaintiff alleges had less experience and seniority than he had at the time of the hiring. (Id., ¶ 11(h)).

4. On March 17, 2000, plaintiff applied for a Chief Infrastructure Officer position, but was not interviewed and the position was given to Emiel Albano, a white male. (Id., ¶ 11(i)).

For all of the above positions, the candidates were interviewed by a committee of three or more persons. (Defs.' 56.1 Stmt ¶¶ 41, 43). Selection for these positions was based on an evaluation of the applicants' resumes, letters of application, experience, skills, education, and personal interview. (Id. ¶ 39). The individual on the committee vested with the authority to select the person was the officer to whom the person would later report. (Id., ¶ 42).

Defendant Thomas Calandrella, the Chief Track Officer, was the hiring decisionmaker for the Assistant Chief Track Officer position when plaintiff applied. (Defs.' 56.1 Stmt. ¶¶ 26, 42). Plaintiff alleges that Calandrella's decision to deny him the Track position was due to his bias against African-Americans. Plaintiff claims that Calandrella's bias was evident because: (1) Calandrella once used the word "nigger" in conversation with a white NYCTA employee; (2) Calandrella once instigated a fight with a non-white employee by using a racial slur; and (3) Calandrella once told a NYCTA employee that as long as he was Chief, he would not promote the plaintiff. (Compl. ¶¶ 12, 13; Defs.' 56.1 Stmt. ¶ 113). Plaintiff also proffers the affidavit of a former NYCTA employee, James Kibbler, who states that Calandrella harbored racial animus towards African-Americans. (Kibbler Aff. ¶ 7).

Plaintiff filed a complaint with the NYCTA's Equal Employment Opportunity Office (hereinafter "EEO") in January 1999, and with the Equal Employment Opportunity Commission

(hereinafter "EEOC") in April 1999, alleging discrimination for failure to promote. (Defs.' 56.1 Stmt. ¶ 4). On March 15, 2000, the EEOC issued a right-to-sue letter which was received by the NYCTA on March 17, 2000. (Defs.' 56.1 Stmt. ¶ 5). Plaintiff claims, however, that he did not receive the right-to-sue letter from the EEOC, and only learned that his charges had been dismissed on December 8, 2001. (Id., ¶ 6). The record shows that the EEOC right-to-sue letter listed the wrong address for plaintiff. (Pl.'s 56.1 Stmt. Ex. 23 at 223; Pl.'s 56.1 Stmt. Ex. 3). Plaintiff made two affirmative attempts to contact his EEOC contact person Robert Blumberg to ascertain the status of his claim, and was told to wait for a letter in the mail. (Pl.'s 56.1 Stmt. Ex. 23 at 221).

Plaintiff claims that subsequent to his filing a complaint with the NYCTA's EEO office in January 1999 and filing a charge of discrimination with the EEOC in April of 1999, his supervisor retaliated against him. Specifically, plaintiff alleges that his supervisor refused to speak with him, and that his evaluations were poor and did not accurately reflect his work. (Compl. ¶¶ 16, 17). Plaintiff also claims that he suffered a loss of vehicles in which he transported materials, making his job more difficult, the loss of an assistant staff analyst, and a transfer from a work location close to his home to one with a one and a half hour commute in each direction. (Compl. ¶¶ 18-20).

In February 2002, plaintiff brought this action against the NYCTA and Thomas Calandrella, claiming that they discriminated against him on the basis of his race by failing to promote him, retaliated against him for engaging in protected activity, and subjected him to a hostile work environment. (Compl. ¶¶ 11, 21-30). Plaintiff further claimed that the defendants are liable for damages for constitutional violations under Sections 1981 and 1983. (Compl. ¶ 22). Defendants, however, contend that summary judgment is appropriate because there are no genuine issues of material fact in dispute.

## II. DISCUSSION

### 1. Summary Judgment Standard

Summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ("Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . ."). However, "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." Gallo v. Prudential Residential Serv., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also Parkinson v. Cozzolino, 238 F.3d 145, 150 (2d Cir. 2001); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000).

Once the moving party establishes that there is no issue of material fact precluding judgment as a matter of law, the non-moving party must then shoulder the responsibility of keeping its case alive. Anderson, 477 U.S. at 250. "[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." Id. (citing Fed. R. Civ. P. 56(e)) (internal quotations omitted). However, the non-moving party must take caution "not [to] rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248 (citing Fed. R. Civ. P. 56(e)). The non-moving party "must do more than show there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574,

586 (1986).  Mere conclusory allegations, speculation or conjecture will not avail a party resisting

summary judgment.  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998); see also D'Amico v.

City of New York, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere

conclusory allegations nor speculation, but instead must offer some hard evidence showing that its

version of the events is not wholly fanciful.").

Summary judgment is appropriate if the court determines that "the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party," a pragmatic approach to

determining whether there is "no genuine issue for trial."  Matsushita, 475 U.S. at 587 (internal

quotes omitted) (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 298 (1968)).  "An

issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the

governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury

could return a verdict for the non-moving party.'"  Konikoff v. Prudential Ins. Co. of Am., 234 F.3d

92, 97 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).  For a judicial determination of what facts

in a particular case qualify as material and which are merely periphery, the Court in Anderson set out

a framework for employing the substantive law:

> As to materiality, the substantive law will identify which facts are
> material.  Only disputes over facts that might affect the outcome of the suit
> under the governing law will properly preclude the entry of summary
> judgment.  Factual disputes that are irrelevant or unnecessary will not be
> counted.  See generally 10A C. Wright, A. Miller, & M. Kane, Federal
> Practice and Procedure § 2725, pp. 93-95 (1983). . . .  That is, while the
> materiality determination rests on the substantive law, it is the substantive
> law's identification of which facts are critical and which facts are irrelevant
> that governs. . . .  [M]ateriality is only a criterion for categorizing factual
> disputes in their relation to the legal elements of the claim.... Anderson, 477
> U.S. at 248.

The Second Circuit has instructed that trial courts must be cautious in granting summary judgment to an employer in an employment discrimination case, because direct evidence of discriminatory intent is rare, and often must be inferred from circumstantial evidence in affidavits and depositions.  See Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).  In reaffirming this proposition, however, the Court has also noted that "summary judgment remains available for the dismissal of discrimination claims lacking genuine issues of material fact."  See Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 603 (2d Cir. 2006) (internal citations omitted); see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.")  I will now turn to the substantive law to use as a guidepost in identifying what facts, if any, would be material to the outcome of this lawsuit.

## 2. Plaintiff's Claims Under New York Law

Plaintiff seeks relief for his alleged discriminatory treatment under the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., and the New York City Administrative Code, N.Y.C. Admin. Code § 8-107.  In their earlier motion to dismiss, defendants relied on a recent amendment to the Public Authorities Law, Section 1266(8), to argue that as a public authority the NYCTA was exempt from claims under the New York City Administrative Code.  See Everson v. New York City Trans. Auth., 216 F. Supp. 2d 71, 79-81 (E.D.N.Y. 2002).  Judge Glasser, citing the 1995 New York State Court of Appeals decision of Levy v. City Commission on Human Rights held that "there is no reason to conclude that, despite the recent amendment to Section 1266(8), the New York Court of Appeals would today decide that the NYCTA is exempt from the reach of the New York City Administrative Code."  See Everson, 216 F. Supp. 2d at 80-81, citing Levy v. City

Commission on Human Rights, 85 N.Y.2d 740 (N.Y. 1996). In this motion, defendants argue that the doctrine of abstention dictates that this issue of state law should be resolved by the state court, and not by this Court. (Defs.' Memo. in Supp. of Summ. J. 28). Paying deference to the fact that Judge Glasser's opinion resolved this issue previously, this Court declines to reconsider the defendants' claim in this decision. The issue is, however, preserved for appellate review.

In considering plaintiff's state law claims, the Court notes that standards for liability under the New York State Human Rights Law and the New York City Administrative Code are the same as those under the equivalent federal anti-discrimination laws. See Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006), citing Forrest v. Jewish Guild for the Blind, 765 N.Y.S.2d 326, 332-33 (N.Y. 2003) ("[T]he standard for recovery under section 296 of the Executive Law is in accord with the federal standards under [Title VII], and the human rights provision of the New York City's Administrative Code mirror the provisions of the Executive Law.") (citations omitted). For this reason, in deciding whether the defendants are entitled to summary judgment under New York law, I will consider whether defendant is entitled to summary judgment under the federal anti-discrimination laws.

### 3. Plaintiff's Title VII Claims

### A. Timeliness of Title VII Claims

The defendants assert that plaintiff's claims are barred as untimely because plaintiff failed to file this cause of action within 90 days of receiving a right-to-sue letter from the EEOC. Title VII has its own statutorily prescribed time limitations. Before claimants can initiate an employment discrimination lawsuit, Title VII requires them to file a charge with the EEOC within 180 days of the alleged unlawful discrimination. 42 U.S.C. § 2000e-5(e); Gomes v. Avco Corp., 964 F.2d 1330, 1332

(2d Cir. 1992). The plaintiff then receives notice of their right to initiate a lawsuit, commonly called a "right-to-sue" letter, from the EEOC. 42 U.S.C. § 20003-5(f)(1). The Second Circuit has interpreted Section 2000e-5(f)(1) to find that a plaintiff must initiate a Title VII lawsuit within 90 days of receiving a right-to-sue letter from the EEOC. See Holt v. KMI-Continental, Inc., 95 F.3d 123, 127 n. 1 (2d Cir. 1996); Sherlock v. Montefiore Med. Ctr., 84 F.3d 522, 525 (2d Cir. 1996).

In the absence of contrary evidence, a right-to-sue letter is presumed to be received three days after it is mailed. Sherlock, 84 F.3d at 525-26, citing Baldwin Cty. Welcome Ctr. v. Brown, 466 U.S. 147, 148 n. 1 (1984) (per curiam). Such presumptions, however, are rebuttable. Sherlock, 84 F.3d at 526. If a claimant presents sworn testimony or other admissible evidence from which it could be reasonably inferred that the notice took longer than three days to reach the claimant, this presumption is not dispositive. Sherlock, 84 F.3d at 526, citing Smith v. Local Union 28 Sheet Metal Workers, 877 F. Supp. 165, 172 (S.D.N.Y. 1995). In addition, a claimant's sworn testimony that he did not receive a right-to-sue letter is enough to rebut the presumption regarding the date of receipt. See Sherlock, 84 F.3d at 526; Holmes v. NBC/GE, 914 F. Supp. 1040, 1043-44 (S.D.N.Y. 1996).

The defendants assert that because the EEOC issued a right-to-sue letter to the plaintiff on March 15, 2000 (Defs.' 56.1 Stmt. Ex. 3) and the plaintiff did not file his complaint until February 19, 2002, the plaintiff's claims are time-barred. (Defs.' Memo. in Supp. of Summ. J. 25-28). Plaintiff avers, however, that he never received the right-to-sue letter, and that he had no notice of the letter until December 18, 2001 when he visited the New York Regional Office of the EEOC to inquire as to his claim. (Compl. ¶ 3; Pl's Memo. in Opp'n. to Summ. J. 19). Plaintiff additionally submits that the EEOC's Charge of Discrimination and the right-to-sue letter both contained the wrong address: the letter lists plaintiff's address as 1700 Bedford Avenue #12<u>6</u>, instead of #12<u>G</u>,

which would be the correct address. (Defs' 56.1 Stmt. Ex. 2; Ex. 23 at 223). Because he initiated his lawsuit within 90 days of receiving notice of the letter on December 18, 2001, plaintiff asserts that his Title VII claims are timely.

In examining the evidence in a light most favorable to the plaintiff, it is clear that there is a genuine issue of material fact in dispute: the date on which plaintiff received the right-to-sue letter from the EEOC. Plaintiff's sworn testimony that he did not receive his right-to-sue letter is enough to rebut the presumption regarding the date of receipt. See Sherlock, 84 F.3d at 526. In considering this, and the fact that the letters contained the wrong address, I find that a reasonable factfinder could determine that plaintiff did not receive his right-to-sue letter. Thus, this claim should not be dismissed based on a failure to pursue a timely claim, but, as discussed *infra*, I will recommend that it be dismissed on the merits.

## B. Liability Under Title VII

Plaintiff has sued defendants Calandrella and NYCTA for unlawful employment discrimination under Title VII for failure to promote and retaliation. Before reaching the substance of the plaintiff's Title VII claims, I note that this Circuit has held that individual defendants with supervisory liability may not be held personally liable under Title VII. See Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam); Tomka v. Seiler, 66 F.3d 1295, 1313 (2d Cir. 1995). Plaintiff has sued his former supervisor in the Track Division, defendant Calandrella, in his individual capacity. Accordingly, it is respectfully recommended that plaintiff's Title VII claims against the individual defendant Calandrella be dismissed, and I will therefore only discuss plaintiff's Title VII claims against the NYCTA.

Title VII makes it "an unlawful employment practice for an employer...to fail or refuse to hire

or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000-e2(a)(1). Plaintiff's failure to promote and retaliation claims are analyzed using the Title VII burden-shifting framework set forth by the Supreme Court in <u>McDonnell-Douglas Corp v. Green</u>. 411 U.S. 792, 802 (1973); <u>see</u> <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 565 (2d Cir. 2000) (failure to promote); <u>see</u> <u>Jetter v. Knothe Corp.</u>, 324 F.3d 73, 75 (2d Cir. 2003) (retaliation).

Under this framework, the plaintiff must first offer evidence to establish a prima facie case of unlawful employment discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802. The burden of establishing a prima facie case is not onerous. <u>Texas Dep't. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253-254 (U.S. 1981); <u>Quarantino v. Tiffany & Co.</u>, 71 F.3d 58, 65 (2d Cir. 1995). In considering whether the plaintiff has established his prima facie case the Court "presume[s] the acts, if not otherwise unexplained, are more likely than not based on the consideration of impermissible factors." <u>Burdine</u>, 450 U.S. at 254, <u>citing</u> <u>Furnco Construction Corp. v. Waters</u>, 438 U.S. 567, 577 (1978); <u>see also</u> <u>Scaria v. Rubin</u>, 117 F.3d 652, 654 (2d Cir. 1997).

Once the plaintiff proves his prima facie case, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for his action. <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Scaria</u>, 117 F.3d at 654. "This burden is one of production, not persuasion; it can 'involve no credibility assessment.'" <u>Reeves v. Sanderson Plumbing Prods.</u>, Inc. 530 U.S. 133, 142 (2000), <u>quoting</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509 (1993). The burden must be supported by admissible evidence which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 507;

Fisher v. Vassar College, 114 F.3d 1332, 1337 (2d Cir. 1997). In addition, the burden, like the plaintiff's initial burden to establish a prima facie case, is not a demanding one. Bickerstaff v. Vasser College, 196 F.3d 435, 446 (2d Cir. 1999) (citation omitted).

If the employer carries this burden, the burden shifts back to the plaintiff to demonstrate by preponderance of the evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253; Fisher, 114 F.3d at 1337 n. 5. In so doing, the plaintiff is required to convince the trier of fact that the defendant's proffered reason is false. McCarthy v. New York City Technical College of City University of New York, 202 F.3d 161, 166 (2d Cir. 2000). "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason" for the employer's decision. St. Mary's Honor Ctr., 509 U.S. at 515. The Court must examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253. If the plaintiff does not show that there is evidence that would allow a rational factfinder to infer that the employer's rationale is pretext, summary judgment is appropriate. See Smith v. American Express Co., 853 F.2d 151, 154-55 (2d Cir. 1988).

**a. Failure to Promote Claim**

In this case, the plaintiff bases his failure to promote claim on four instances in which he applied for and was denied a position within the NYCTA. More specifically, the plaintiff applied for the Assistant Chief Infrastructure Officer, Assistant Chief Electrical Officer, Chief of Infrastructure

and Assistant Chief Track Officer positions, which were awarded to applicants plaintiff alleges were less qualified white employees. It is useful to separate the Assistant Chief Track Officer position from the three other positions because they require slightly different analysis.

**1. Assistant Chief Infrastructure Officer, Assistant Chief Electrical Officer, and Chief Infrastructure Officer positions**

The plaintiff applied for and was denied a promotion in three instances, and he contends that this failure to promote was based on illegal race considerations. More specifically, plaintiff claims:

1. On May 26, 1999, he applied for an Assistant Chief Infrastructure Officer position in the Infrastructure Division, but the position was given to Frank Gaetano, a white male with less experience and seniority than the plaintiff at the time of the hiring. (Compl. ¶ 11(g)). Richard Wachenheim, the Chief Infrastructure Officer, was the hiring decisionmaker for this position. (Def.'s 56.1 Stmt. ¶¶ 42, 72).

2. On November 19, 1999, he applied for an Assistant Chief Electrical Officer position, but the position was given to Richard Curcio, a white male with less experience and seniority than the plaintiff at the time of the hiring. (Compl. ¶ 11(h)). Frank Asnes, the Chief Electrical Officer, was the hiring decisionmaker for this position. (Def.'s 56.1 Stmt. ¶¶ 42, 76).

3. On March 17, 2000, he applied for a Chief Infrastructure Officer position, but the position was given to Emiel Albano, a white male. (Compl. ¶ 11(i)). Mark Yanche, the Chief of Operations at this time, was responsible for the selection of Mr. Albano. (Def.'s 56.1 Stmt. ¶ 90).

### i. Plaintiff's Prima Facie Case

A plaintiff's burden in presenting prima facie evidence of discrimination is <u>de minimis</u>. <u>Abdu-Brisson v. Delta Airlines</u>, 239 F.3d 456, 467 (2d Cir. 2001). The plaintiff can satisfy his burden of establishing a prima facie case of discrimination by showing that (1) he is a member of a protected class (2) he was qualified for the position at issue (3) he was denied the position and (4) the circumstances of the adverse employment decision give rise to an inference of discrimination. <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 377-378 (2d Cir. 2003).

As an African-American who was denied a promotion, the plaintiff satisfies the first and third elements of his prima facie case. See <u>Mormol v. Costco Wholesale Corp.</u>, 364 F.3d 54, 57 (2d Cir. 2004) (holding that failure to promote is an adverse employment action). The issue of whether plaintiff satisfies the second prong of the test, whether he was qualified for these positions, is one of contention between the parties.

Defendants maintain that because plaintiff worked for 32 years only in the Track Division of the NYCTA, he was not qualified for the positions in the Electrical and Infrastructure Divisions. (Defs.' Memo. in Supp. of Summ. J. 7). Plaintiff counters, however, that he was qualified for these positions because he was known for "his superior productivity and quality work," his "ability to perform arduous tasks and solve problems quickly under adverse circumstances," and his "unparalleled work ethic." (Pl.'s Memo. in Opp'n. to Summ. J. 4). Plaintiff also describes his lengthy supervisory and management experience as Foreman, Deputy Superintendent, Superintendent, and General Superintendent in the Track Division. (<u>Id.</u>, at 5).

I find that the plaintiff has satisfied the second prong of his prima facie case, i.e., the question of whether his experience made him qualified for these positions, for he has proffered that he has the

"minimal qualifications" and "basic skills" required.  See Slattery, 248 F.3d at 92.   Although it is true that the plaintiff remained within the Track Division for his entire career at the NYCTA, his management experience and reputation as a superior worker could commend him to higher positions in other departments.

The defendants additionally assert that the plaintiff has failed to establish the fourth prong of his prima facie case - that he was not promoted under circumstances giving rise to an inference of discrimination.  The Second Circuit has repeatedly found that a plaintiff can satisfy this fourth prong simply by showing that "a [person] similarly situated was treated differently" from the plaintiff.  See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001), citing Shumway v. United Parcel Service, Inc., 118 F.3d 60, 63 (2d Cir. 1997); see also Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994) ("circumstances contributing to an inference of discriminatory intent may include...the more favorable treatment of employees not in the protected group.").  In fact, the Circuit has found that "the mere fact that a plaintiff was replaced by someone outside [his] protected class will suffice for the required inference of discrimination at the prima facie stage of Title VII analysis."  Zimmerman v. Associates First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001), citing Tarshis v. Riese Organization, 211 F.3d 30, 36 (2d Cir. 2000); see Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1239 (2d Cir. 1995); see also Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001) (plaintiff "easily made out a prima facie case" where he was 62 years old, he was qualified for the position, and yet it was given to a younger applicant. [2]   Therefore, if the

_____

[2] Although the above cited cases make clear such evidence is all that is necessary to establish the fourth prong of a plaintiff's prima facie case, other Second Circuit precedent is less clear on this point.  See Denny Chin & Jody Golinsky, Moving Beyond McDonnell Douglas: A Simplified Method for Assessing Evidence in Discrimination Cases, 64 Brook. L. Rev. 659, 663-64 (1998) ("The subtle yet important changes as to what constitutes a prima face case are confusing.")  For example, in the recent Abdu-Brisson case, after stating that the fourth prong

plaintiff need only prove that he was an African-American, he applied for a position for which he was qualified, and it was given to a white applicant, then he has fulfilled his de minimis burden in establishing the fourth and final prong of his prima facie case. Because plaintiff has established his prima facie case, the issue remains as to whether the plaintiff has demonstrated that defendants' articulated reason for not promoting him is merely a pretext for discrimination.

**ii. Defendants' Legitimate Reason and Pretext**

As previously stated, if the plaintiff has established a prima facie case, a presumption of discrimination arises and the burden shifts to the defendants to offer a "legitimate, non-discriminatory reason for the employment decision." See McDonnell Douglas, 411 U.S. at 802. Then, under the final step of the McDonnell Douglas framework, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that defendants' proffered reason is a pretext, and that race discrimination was indeed a motivating factor for terminating plaintiff's employment. Id.

Regarding the Infrastructure and Electrical positions, defendants' proffered reason for not promoting the plaintiff was that he was "barely (if at all) qualified for the positions." (Defs.' Memo. in Supp. of Summ. J. 2). Even though this explanation is nominal, plaintiff does not succeed in proving that this was a pretext for discrimination. Plaintiff first claims that the chosen applicants for the positions, who were white, "had less experience" and "were less qualified" than he was. (Pl.'s Memo. in Opp'n. to Summ. J. 8). The plaintiff acknowledges in his deposition, however, that the

---

could be established by proof of differential treatment, the Court then noted that "stray remarks of a decisionmaker" are not enough to support this fourth prong. Abdu-Brisson, at 467-68. The Court later held that the plaintiff had established this fourth prong because the employer made "numerous comments" about older employees, and had an "all-consuming interest in the age...of employees." Id. Had the Abdu-Brisson Court adhered to the preferential treatment standard, this analysis would have been unnecessary.

three individuals promoted were as qualified as he was for the positions. (See Pl.'s 56.1 Stmt. Ex. 23 at 38, 49, 54). Furthermore, the record contains not a shred of other evidence demonstrating the racial animus of the hiring decisionmakers for these positions- Richard Wachenheim, Frank Asnes, and Mark Yanche- or a history of discrimination in hiring for these positions at the NYCTA. Plaintiff's focus on the racial animus of defendant Calandrella is simply not relevant to these positions because Calandrella was not the hiring decisionmaker here.

In sum, the plaintiff does not satisfy his burden in proving by a preponderance of the evidence that defendants' proffered reason was pretextual, and that discrimination was the reason for the failure to promote him. Plaintiff has not produced enough evidence under which a reasonable factfinder could infer that the promotion decision was based on illegal race discrimination. For this reason, the Court respectfully recommends defendants' motion for summary judgment be granted as to the plaintiff's claims of discrimination regarding the Infrastructure and Electrical positions.

## 2. Assistant Chief Track Officer Position

Plaintiff's next discrimination claim is based on defendant NYCTA's failure to promote him to the Assistant Chief Track Officer position. Specifically, the plaintiff claims that on September 18, 1998, he applied for the Assistant Chief Track Officer position, but the position was given to Ralph DellaMonica, a white male. (Def.'s 56.1 Stmt. ¶¶ 36, 54). Thomas Calandrella, the Chief of the Track Division during this time, was the hiring decisionmaker for this position. (Id., ¶¶ 46, 47).

The requirements for the Assistant Chief Track Officer position included twelve years of experience with track maintenance and construction, eight years of these in a supervisory or managerial capacity, which both plaintiff and DellaMonica possessed. (Id. ¶¶ 45, 54-57). Plaintiff alleges, however, that DellaMonica had less experience and seniority than himself. (Pl.'s 56.1 Stmt.

18

¶¶ 62, 63). Plaintiff contends that the type of track work that he performed in the 1970's put him "head and shoulders" above the other candidates who did not perform these duties, DellaMonica included. (Id. ¶ 62). Plaintiff additionally asserts that when he was a Foreman in the early 1980's, he directly supervised DellaMonica. (Id. ¶ 63).

Calandrella, however, stated that he chose DellaMonica because "he presented his ideas, during the interview, in the clearest and most comprehensive way, gave an excellent 'required presentation'...and answered all questions that came up during the interview, clearly and thoughtfully." (Defs' 56.1 Stmt. Ex. 24, Calandrella Memo dated Nov. 19, 1998). Indeed, the committee ratings on the Applicant Flow Data sheet show that plaintiff was ranked below all but one of the six candidates that applied for this position. (Defs.' 56.1 Stmt. ¶ 61).

**i. Prima Facie Case**

As discussed earlier, a plaintiff's burden in presenting prima facie evidence of discrimination is de minimis. Abdu-Brisson v. Delta Airlines, 239 F.3d 456, 467 (2d Cir. 2001). As an African-American who was denied a promotion, the plaintiff satisfies his burden in establishing the first and third prongs of his prima facie case. See Mormol, 364 F.3d at 57. In addition, the defendants do not contest, and the Court agrees, that plaintiff satisfies the second prong of his prima facie case, as he was clearly qualified for the Assistant Chief Track Officer position. The plaintiff was employed by the Track Division for 32 years, and he was a General Superintendent at the time of applying for the Assistant Chief of Track position, which is one career position lower than the Assistant Chief Track Officer position. (Pl.'s 56.1 Stmt. ¶¶ 24, 32). Moreover, the plaintiff had an unblemished attendance record and satisfactory evaluations. (Id.) These facts are clearly sufficient to fulfill plaintiff's "minimal" burden in proving his qualifications. Slattery, 248 F.3d at 92.

Furthermore, plaintiff easily establishes his prima facie case by proving that he as an African-American was not promoted, while a person outside his protected class was. See discussion, section II(2)(B)(1)(i), supra; see also Zimmerman v. Associates First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001), citing Tarshis v. Riese Organization, 211 F.3d 30, 36 (2d Cir. 2000). However, even if plaintiff was able to make out a prima facie case, he is not able to demonstrate that the defendants' proffered reason for not promoting him was merely a pretext for discrimination.

## ii. Defendants' Legitimate Reason and Pretext

The NYCTA contends that Calandrella's legitimate reason for hiring DellaMonica instead of the plaintiff was DellaMonica's superior performance in his interview. (Defs.' Memo. in Supp. of Summ. J. 18). In a memo dated one month after plaintiff was interviewed, Calandrella wrote that DellaMonica was selected because "he presented his ideas, during the interview, in the clearest and most comprehensive way, [and] gave an excellent 'required presentation' on the subject of 'Track Maintenance in a Time of Reduced Budgets and Manpower.'" (Id., citing Defs.' 56.1 Stmt. Ex. 24). Furthermore, Calandrella assessed plaintiff's interview as inferior to that of DellaMonica. (Defs.' Memo. in Supp. of Summ. J. 17).

There is ample evidence to support this explanation. While the record shows that both DellaMonica and plaintiff were qualified for the Assistant Chief Track Officer position, (Pl.'s Memo. in Supp. of Summ. J. 17), there is no reason to suspect that Calandrella fabricated his reasons after the filing of plaintiff's lawsuit: Calandrella's memorandum detailing his reasons for hiring DellaMonica was made contemporaneously with the promotion decision.

Furthermore, plaintiff was interviewed for the position by four persons- Thomas Calandrella, Nathaniel Ford, Charles Morehouse, and Joan Cox- two of whom are African-American: Morehouse

and Fox. (Defs.' 56.1 Stmt. ¶ 52). The Applicant Flow Data sheet shows the rankings of those interviewed and plaintiff was ranked fifth out of six applicants by all of those who interviewed him. (Id., ¶¶ 52, 61, Ex. 7). It is also clear that Calandrella and the hiring committee adhered to clearly established hiring standards and interviewing procedures in choosing the person for the job. See Stern v. Trustees of Columbia University in City of New York 131 F.3d 305, 313 (2d Cir. 1997).

Plaintiff has produced no evidence that the defendants' reasons for its hiring decision were false, nor does he show that the reasons offered were a pretext for discrimination. Plaintiff argues that defendants' explanations are pretext for racial discrimination because (1) plaintiff was clearly more qualified than DellaMonica and (2) Calandrella exhibited "discriminatory animus" against African-Americans. (Pl.'s Memo. in Opp'n. to Summ. J. 8). Neither of these arguments persuade me that a genuine issue of fact remains as to whether Calandrella's employment decisions were discriminatory.

First, plaintiff's claims that DellaMonica's qualifications "paled in comparison to plaintiff's," (Pl.'s Memo. in Opp'n. to Summ. J. 10), are neither supported by the record nor sufficient as a matter of law to prove pretext. Plaintiff argues that with his ten years more seniority, DellaMonica's promotion was contrary to established Department of Transportation customs and procedures that generally favor more senior applicants. (Pl.'s Memo. in Opp'n. to Summ. J. 12). Plaintiff also claims that he supervised DellaMonica early in DellaMonica's career. (Pl's Memo. in Opp'n. to Summ. J. 12).

To prove that he was more qualified than DellaMonica, plaintiff relies on the affidavit of Edward Dixon, the Assistant Chief Track Officer who retired in 1998 leaving vacant the position to which plaintiff and DellaMonica applied. In his affidavit Dixon states he "found it puzzling and somewhat disturbing" that the NYCTA would promote DellaMonica to his former position rather than

the plaintiff, whose "qualification appreciably outweighed Mr. DellaMonica's at the time both applied." (Dixon Aff. ¶ 16). Dixon noted that the Assistant Chief Track Officer position requires primarily track maintenance and not track construction, and yet DellaMonica possessed "almost no appreciable track maintenance experience." (Id., ¶¶ 12, 16). Plaintiff, on the other hand, possessed substantial knowledge of track maintenance. (Id., ¶ 14). Dixon also calls Everson "among the most dedicated, responsible, motivated, and highly-skilled employees in the [Department of Transportation]." (Id. ¶ 6).

Although plaintiff was clearly qualified for the Assistant Chief Track Officer position, simply comparing his qualifications with DellaMonica's is not enough to establish that Calandrella used impermissible considerations. Plaintiff and Dixon's statements that plaintiff was more qualified than DellaMonica are opinions and are not supported by the record here. That plaintiff had more experience in track maintenance is not dispositive, because the job requires both track maintenance and track construction experience. (See Defs.' 56.1 Stmt. ¶ 45). If the plaintiff's case rested only on the difference between his qualifications and DellaMonica's, "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." Byrnie v. Town of Cromwell, 243 F.3d 93, 103 (2d Cir. 2003). The fact that a four person panel of decisionmakers, including two African-Americans, ranked plaintiff next to last out of six candidates not only counters an inference of impermissible racial bias, but adds credence to Calandrella's statement that DellaMonica was hired because of his performance in the interview. As the Supreme Court cautioned in Burdine, it is not this Court's role to act as a "super personnel department," or to second-guess an employer's business judgment in an employment decision. See

<u>Texas Dep't of Comm. Affairs v. Burdine</u>, 450 U.S. 248, 259 (1981) ("[An] employer has the discretion to choose among equally qualified candidates, so long as the decision is not based on unlawful criteria"). Plaintiff's credentials are simply not superior enough to DellaMonica's for the Court to infer that Calandrella based his decision on illegal race discrimination.

Plaintiff next asserts that Calandrella's failure to promote him was based on "racial animus" against African-Americans. Specifically, the plaintiff claims that he once heard Calandrella used the word "nigger" in conversation with a white NYCTA employee, Guido Boniello. (Compl. ¶ 12). Plaintiff further points to a second incident in 1979, when Calandrella allegedly instigated an altercation with a non-white employee by using a racial slur. (Compl. ¶ 13; Pl.'s 56.1 Stmt. Ex. 23 at 210-11). At deposition, however, plaintiff conceded he was not present at the altercation, received this information from others, and had "no concrete basis" for speculating that Calandrella used a racial slur at all. (Pl.'s 56.1 Stmt. Ex. 23 at 211).

Additionally, the plaintiff relies on the affidavit of James Kibbler, a NYCTA employee who retired in 1992 but worked with Calandrella for approximately 15 years. Kibbler's affidavit states that he "knew Calandrella to harbor animosity and hostility towards Black Transit employees, and on several occasions, personally heard Calandrella make patently offensive, racist remarks toward other Black employees." (Kibbler Aff. ¶ 7). Kibbler's affidavit cites two examples: one in which Calandrella allegedly called an African-American employee a "gorilla," and another when Calandrella allegedly told an African-American employee to "shut his Black mouth." (<u>Id.</u>, ¶ 8).

Once again, plaintiff's proffered evidence of Calandrella's alleged racial animus is simply not enough for the plaintiff to establish that Calandrella's explanations for not promoting him were pretext for racial discrimination. In fact, plaintiff admitted that Calandrella has in the past promoted the following persons of color: Terry Rumpf, Fitzroy Thomas, Franz Theodore, and Ronnie Smith. (Pl.'s

56.1 Stmt. Ex. 23 at 59).  In 1996 Calandrella selected Fitzroy Thomas, an African-American, to be an Assistant Chief who would work with and report directly to him.  (Plaintiff's 56.1 Stmt. ¶¶ 33, 34, 35).[3]

The Second Circuit has found that stray remarks of a decisionmaker cannot prove a claim of employment discrimination, unless "other indicia of discrimination are properly presented."  Abdu-Brisson v. Delta Airlines, Inc. 239 F.3d 456, 468 (2d Cir. 2001), citing Danzer v. Norden Systems, Inc., 151 F.3d 50, 56 (2d Cir. 1998).  In Abdu-Brisson, an age discrimination case analyzed under the same framework, the Court found that the plaintiff had not proven that defendants' reasons for firing the plaintiff were pretextual, even though the employer made numerous contemporaneous comments about older employees, calling them "burdensome," "contaminated," and "Bad Apples," and had an "all-consuming interest in the age and projected retirement rates" of employees.  Abdu-Brisson, 239 F.3d at 462, 468.   In Danzer, however, the Court found that plaintiff had established a case of age discrimination where the employer asked for an age breakdown of all employees, and stated in two separate meetings that most workers were "old fogies" and that he wanted to "raise the IQ" of employees by finding younger workers.  Danzer, 151 F.3d at 57.  These comments coincided with a sudden change in the plaintiff's evaluation ratings, culminating in the firing of the plaintiff.  Id.

As the above cases illustrate, plaintiff's proffered evidence of Calandrella's racial animus is simply not enough for the plaintiff to establish that Calandrella's explanations were pretext for racial discrimination.  The plaintiff only claims to have personally heard Calandrella use a racial slur in an off-hand manner on one occasion more than fourteen years before he was denied a promotion.  In addition, plaintiff admitted he had no factual basis or personal knowledge for his assertion that

---

[3] Plaintiff's claim that Calandrella only hired Thomas because he "knew he needed to hire a minority" and because Thomas was an African-American employee Calandrella could "easily manipulate and control," (Pl.'s Memo. in Opp'n. to Summ. J. 9), is simply speculation without any factual basis.

Calandrella got into an altercation with another employee over a racial slur. See Federal Rule of Civil Procedure 56(e) (requiring supporting affidavits to be based on personal knowledge and specific facts); see also Danzer, 151 F.3d at 56; Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Plaintiff's affidavit is comprised mostly of conclusory statements about Kibbler's belief that Calandrella was racist, with little factual support for these claims. Furthermore, Kibbler retired in 1992, more than six years before the failure to promote plaintiff, thus these statements were not even remotely temporally related to the employment decision. See Young v. Pitney Bowes, Inc., 03-CV-1161, 2006 U.S. Dist. LEXIS 20788, at *59-60 (D. Conn. Mar 21, 2006) (where the Court found that in order to determine whether a remark was "stray," a court should consider whether it was made in relation to the employment decision at issue). Lastly, Kibbler's affidavit offers no personal knowledge with respect to the motivation for or the circumstances surrounding the failure to promote the plaintiff. See Patterson, 375 F.3d at 222.

Thus I conclude that plaintiff has not established that defendants' legitimate reason for failing to promote him was pretextual. Therefore, I respectfully recommend that defendants' motion for summary judgment be granted as to the plaintiff's failure to promote claim based on the Assistant Chief Track Officer position.

**b. Retaliation Claim**

Plaintiff asserts that defendant NYCTA retaliated against him for filing an internal complaint of discrimination with the NYCTA's EEO office in January of 1999 and a charge of discrimination with the EEOC in March of 1999. Plaintiff claims that his supervisors retaliated against him by (1) giving him negative evaluations in 1999 and 2000; (2) reducing the vehicles assigned to his workspace over a two-year period; (3) refusing to reassign a staff analyst to him after March 2000; (4) transferring him to a workplace farther away from his home in December of 2001; (5) refusing to speak to him at his workplace after he filed his claims; and (6) not praising him for his work after the September 11th

terrorist attacks, while praising other employees who did not file claims.

Title VII prohibits employers from retaliating against employees because those individuals opposed potentially discriminatory practices of the employer. 42 U.S.C. § 2000e-3(a). Such retaliation claims are analyzed using the <u>McDonnell Douglas</u> burden-shifting framework as articulated earlier in this decision. <u>See</u> <u>Texas Department of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981); <u>see also</u> <u>Feingold v. New York</u>, 366 F.3d 138, 157 (2d Cir. 2004).

Under the <u>McDonnell Douglas</u> test, the plaintiff must first present a prima facie case of retaliation by showing (1) participation in a protected activity known to the defendant (2) an employment action disadvantaging the plaintiff and (3) a causal connection between the protected activity and the adverse employment action. <u>Cifra v. General Electric Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001). As stated earlier, a plaintiff's burden in establishing this prima facie case is <u>de minimis</u>. <u>Slattery v. Swiss Reinsurance America Corp.</u>, 248 F.3d 87, 94 (2d Cir. 2001) (citation omitted).

With regard to the first prong of a prima facie case, "protected activity" under Title VII refers to any action taken to oppose statutorily prohibited discrimination. <u>See</u> 42 U.S.C. § 2000e-3. In addition, in satisfying the knowledge requirement, only general corporate knowledge that the plaintiff engaged in a protected activity is necessary. <u>Gordon v. New York City Bd. Of Educ.</u>, 232 F.3d 111, 116 (2d Cir. 2000). Plaintiff's filing of an internal complaint is enough to put an employer on notice that the plaintiff was engaged in protected activity. <u>Alston v. New York City Transit Auth.</u>, 14 F. Supp. 2d 308, 311 (S.D.N.Y. 1998).

In <u>Burlington Northern</u>, the Supreme Court resolved a split among the circuits over what employer conduct was required to satisfy the second prong of a plaintiff's prima facie case of retaliation under Title VII. <u>See</u> <u>Burlington Northern & Santa Fe Ry. v. White</u>, 126 S.Ct. 2405, 2410 (2006); <u>see</u> <u>Kessler v. Westchester County Dep't. Of Social Services</u>, 461 F.3d 199, 206 (2d Cir. 2006). In doing

so, the Court announced a different standard from that which had been used by the Second Circuit previously. See Kessler, 461 F.3d at 206-08 (discussing the Supreme Court's abrogation of Second Circuit precedent on what constitutes an adverse employment action). The Supreme Court held that adverse employment actions are "those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant," or those that would "dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 126 S.Ct. at 2410. The Court noted that the anti-retaliation provision under Title VII prohibited a broader range of conduct than what is prohibited by the anti-discrimination provision. Id., at 2414. The Court also stated, however, that filing a discrimination case "cannot immunize [an] employee from those petty slights or minor annoyances that often take place at work and that all employees experience," and emphasized that an employment action must be materially adverse so as to separate significant and trivial harms. Burlington Northern, 126 S.Ct. at 2415.

With regard to the third prong of a prima facie case of retaliation, proof of causation between the protected activity and the retaliation can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. New York City Bd. Of Educ., 232 F.3d 111, 117 (2d Cir. 2000), citing Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993). The Second Circuit has not yet established a bright line rule for determining when retaliatory conduct is said to have "followed closely" behind a plaintiff's protected activity. See Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001).

As with other Title VII discrimination claims evaluated under the McDonnell Douglas

framework, if the plaintiff makes out a prima facie case of retaliation, it then falls to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action.  Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).  If the employer meets this burden, the plaintiff then has the burden of proving that the proffered reason is false, and that retaliation was a substantial reason for the employer's action.  Id.

Here plaintiff bases his claim on six separate employment actions that he alleges were in retaliation for his filing a discrimination claim.  Neither party disputes that the plaintiff has established the first prong of his prima facie case: that by filing a discrimination claim within the NYCTA and then with the EEOC, plaintiff participated in a protected activity that was known to the defendant.  See Alston, 14 F. Supp. 2d at 311.  I will discuss whether plaintiff has established the second and third prongs of his prima facie case and the remainder of the McDonnell Douglas burden shifting test as related to each employment action separately.

1.  Negative Evaluations for 1999 and 2000

Plaintiff first argues that his negative evaluations in 1999 and 2000 were retaliatory.  (Defs.' 56.1 Stmt. ¶ 96).  Plaintiff received an evaluation of "Good" for both of these years, out of a scale of "Excellent," "Good," "Marginal" and "Poor."  (Pl.'s 56.1 Stmt. Ex. 11; Ex. 16).  An unfavorable performance review is not an adverse employment action for purposes of a retaliation claim without some other tangible job consequence.  See Carmellino v. District 20 of New York City Dep't of Education, 03-CV-5942, 2006 WL 2583019 *32 (S.D.N.Y. Sept. 6, 2006), citing Jackson v. City Univ. of N.Y., 05-CV-8712, 2006 U.S. Dist. LEXIS 43338, *3 (S.D.N.Y. June 26, 2006).  The plaintiff argues, and the Court agrees, that these evaluations could be materially adverse because in the NYCTA merit-based raises are awarded based on such evaluations and plaintiff has not received a merit-based award for several years.  (Pl.'s Memo. in Opp'n. to Summ. J. 24; Everson Aff. ¶ 38).  Furthermore, the

fact that these evaluations were made in the two years following his discrimination claims is sufficient to raise a material fact as to causation. Therefore, viewing the evidence in a light most favorable to the plaintiff, the Court agrees that this is sufficient for plaintiff to establish his prima facie case of retaliation.

Defendants, however, have offered a legitimate, non-retaliatory reason for these negative evaluations. Defendants maintain that these evaluations were accurate reviews of plaintiff's performance for those two years. For example, in 1999 plaintiff was substantially over budget on overtime allowances, and was unaware in meetings of exactly how much over budget he was. (Pl.'s 56.1 Stmt. Ex. 15). In addition, defendants note that plaintiff challenged his performance reviews for both years, and in both cases they were upheld by NYCTA review boards. (Defs' Memo. in Supp. of Summ. J. Ex's. 12-15 (1999 evaluation); Ex's. 17-22 (2000 evaluation)).

In contending that the defendants' non-retaliatory explanations are pretextual, plaintiff argues that his "Good" rating in the 1999 "safety management" category was unwarranted, because the accidents occurring in the plaintiff's subdivision were caused not by him but by injured employees' violation of safety protocols. (Pl.'s Memo. in Opp'n. to Summ. J. 28; Def.'s 56.1 Stmt. Ex. 12). Plaintiff also claims that his "Good" rating in the 1999 "management results" category was unwarranted considering the fact that he exceeded his production goals by 77% that year. (Pl.'s Memo. in Opp'n. to Summ. J. 28). Plaintiff challenges his budgetary overruns by contending that his supervisor authorized and directed him to use his staff in a manner that resulted in these overruns. (Pl.'s Memo. in Opp'n. to Summ. J. 28; Everson Aff. ¶ 39). Plaintiff's internal memorandum appealing his "Good" rating for 2000 argues more generally that this rating was unwarranted because of his achievements and superior skills during that year. (Pl.'s 56.1 Stmt. Ex. 17). I also note that plaintiff's evaluations changed after he filed his complaint: he received an "Excellent" evaluation in 1997 and 1998, but received a "Good"

evaluation in 1999, 2000, and 2001 after he filed his discrimination claim. (Def.'s 56.1 Stmt. Exs. 11, 16).

Viewing these facts in a light most favorable to the plaintiff, I find that the plaintiff has put forth facts that could support the conclusion that the defendants' explanations are pretextual. The fact that plaintiff's ratings lowered the two years after his discrimination complaints despite his previously unblemished record gives me pause. In addition, the question of whether plaintiff was deserving of these 1999 and 2000 evaluations is in dispute, and so should be decided by a factfinder and not by this Court at the summary judgment stage. Thus, I respectfully recommend that summary judgment be denied as to this retaliation claim.

2. Reduction in Vehicles and Reassignment of a Staff Analyst

Plaintiff alleges that the number of vehicles assigned to him was reduced over a two year period and that his assistant staff analyst was reassigned in March 2000 in retaliation for his filing a discrimination complaint. (Defs.' 56.1 Stmt. ¶ 96; Pl.'s 56.1 Stmt. Ex. 23 at 74-75). Because of these two actions, plaintiff claims that he was unable to determine the extent of his budget overruns, and was less able to perform routine functions in his unit, which led to his negative evaluations in 1999 and 2000. (Everson Aff. ¶ 39).

Defendants answer these claims with two simple statements: (1) "[t]he alleged retaliatory transfer of a staff analyst in March 2000 reduced the number of staff analysts assigned [to the plaintiff's workplace] from 'five or six' to 'four or five,'" and (2) "[t]he alleged retaliatory reduction in vans in the fleet of vehicles assigned to plaintiff's operation reduced...the number of vans by two (from ten or eleven vans to eight or nine vans)." (Defs.' Memo. in Supp. of Summ. J. 9). These actions, defendants contend, "fail as a matter of law to constitute adverse employment actions." (Id. at 9). Furthermore,

defendants argue, "there is no evidence that [his supervisor] even knew of plaintiff's complaints against" the NYCTA. (Defs.' Reply Memo. in Supp. of Summ. J. 4).

In considering the limited evidence in the record, I simply cannot recommend granting summary judgment as to these two retaliation claims. First, the supervisor's knowledge of plaintiff's complaints is inconsequential, for a plaintiff's filing of an internal complaint is enough to put an employer on notice that the plaintiff was engaged in protected activity. See Alston, 14 F. Supp. 2d at 311. In addition, although the record is spare on this point, a reasonable factfinder could believe that the reduction of vehicles and the transfer of a staff analyst had a deleterious affect on plaintiff's work environment, making his job more arduous and resulting in negative evaluations. The defendants have not, in fact, advanced a legitimate reason for these transfers. Therefore, in viewing the evidence in a light most favorable to the plaintiff, I recommend that the defendants' motion for summary judgment as to these two retaliation complaints be denied.

3. Workplace Transfer

Plaintiff contends that his transfer in December of 2001 from a workplace in Brooklyn to one in the Bronx, which was substantially farther from his residence, was retaliatory. (Defs.' 56.1 Stmt. ¶ 96; Pl.'s Memo. in Opp'n. to Summ. J. 25). A transfer or reassignment of job duties is not automatically actionable, but must also be an adverse employment action. See Burlington Northern, 126 S. Ct. at 2417. For example, in Burlington Northern, the Supreme Court found that the reassignment of the plaintiff from one position to another was an adverse employment action where the reassigned position was less prestigious, more arduous and "dirtier" than her previous position. Id., at 2417. Subsequent to the Burlington Northern case, the Second Circuit similarly found that a plaintiff's transfer to an office where he would not be allowed to perform the discretionary and managerial

functions of his position, no one would report to him, and he would be forced to do work normally performed by lower-level personnel was an adverse employment action. <u>Kessler v. Westchester County Dep't of Social Services</u>, 461 F.3d 199, 209-10 (2d Cir. 2006); <u>see also</u> <u>Perez v. Consolidated Edison Corp. of N.Y.</u>, No. 02-CV-2832, 2006 WL 2707316, at *13 (S.D.N.Y. Sept. 20, 2006) (where plaintiff's temporary transfer to a work site in a different location in New York City was an adverse action because it resulted in a loss of shift differential and overtime pay).

In this case, plaintiff has failed to prove that his transfer from Brooklyn to the Bronx was a materially adverse employment action. After scouring the available record, it is clear the plaintiff bases his argument on the transfer work site's mere distance from his home but offers no other damaging consequences of the transfer. (Pl.'s 56.1 Stmt. Ex. 23 at 216-18).[4] The fact that the transfer was inconvenient is not enough to make it materially adverse. <u>See</u> <u>Burlington Northern</u>, 126 S. Ct. At 2416; <u>Kessler</u>, 461 F.3d at 209-10; <u>Perez</u>, 2006 WL 2707316 at *13.

Even had the plaintiff established that it was adverse, the defendants have put forth legitimate non-retaliatory explanations for the transfer: (1) that plaintiff and his co-workers had been transferred previously as a part of their employment and (2) that plaintiff was transferred along with three other workers because of problems his supervisor was having with the union at another site. (Defs' Memo. in Supp. of Summ. J. 10, 25). Plaintiff offers no evidence that these reasons are pretext other than his conclusory statement that his supervisors "conspired to transfer plaintiff to the Bronx in retaliation for plaintiff's complaints of discrimination." (Pl.'s 56.1 Stmt. ¶ 104). I, therefore, recommend that

---

[4]In his Reply Memorandum, plaintiff claims that he "was forced to shoulder increased responsibilities following his transfer, without a corresponding increase in salary," and cites to paragraph 43 of his own Affidavit. (Pl.'s Reply Memo. in Supp. of Summ. J. 25, <u>citing</u> Everson Aff. ¶ 43). However, in reviewing this affidavit and the entire record there is no mention of these increased responsibilities or lack of increase in salary.

summary judgment be granted as to the plaintiff's retaliation claims based on his work site transfer.

4. <u>Refusal to Speak to Plaintiff and Failure to Praise His Work After September 11th</u>

Plaintiff claims that his supervisor's refusal to speak to him at his workplace (Compl. ¶ 16) and failure to recognize his efforts at Ground Zero after the September 11th terrorist attacks were retaliatory. (Pl.'s 56.1 Stmt. ¶ 96; Everson Aff. ¶ 11). These claims are without merit. First, the plaintiff's proffered evidence of his supervisor's refusal to speak with him is illusory at best: plaintiff acknowledged at his deposition that he met with his supervisor every Wednesday morning and he was not ignored at these meetings. (Defs.' 56.1 Stmt. Ex. 23 at 70). Furthermore, these complaints are akin to the "petty slights or minor annoyances that often take place at work and that all employees experience," something the Supreme Court warned would not constitute an adverse employment action. <u>Burlington Northern</u>, 126 S. Ct. at 2415. A reasonable factfinder could simply not find that this treatment was an employment action at all, or that it was materially adverse enough to dissuade a reasonable worker from making a discrimination charge. <u>See</u> <u>Burlington Northern</u>, 126 S. Ct. at 2410. For this reason, I recommend summary judgment be granted as to this retaliation claim.

**c. Hostile Work Environment Claim**

Plaintiff alleges that he suffered unlawful race discrimination in the form of a hostile work environment. (Pl.'s 56.1 Stmt. ¶¶ 1, 8). This hostile work environment claim is based on evidence detailed earlier in the decision, (<u>see</u> section 3(B)(a)(2)(ii), <u>supra</u>), summarized as: (1) Calandrella's use of the word "nigger" to employee Guido Boniello; (2) Calandrella's instigation of a fight with a non-white employee by using a racial slur; (3) Calandrella's statement to Edward Dixon that plaintiff would not be promoted as long as Calandrella was Chief Track Officer; and (4) James Kibbler's affidavit contending that Calandrella "harbors racial animus."

In order to establish a claim of hostile work environment, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006). Plaintiff must show not only that he subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive. Demoret, 451 F.3d at 149, citing Hayut v. State Univ. of New York., 352 F.3d 733, 745 (2d Cir. 2003).

"[M]ere utterance of an...epithet which engenders offensive feelings in an employee...does not sufficiently affect the conditions of employment to implicate Title VII." Harris, 510 U.S. at 21. In addition, isolated incidents typically do not rise to the level of a hostile work environment unless they are "of sufficient severity" to "alter the terms and conditions of employment as to create such an environment." Demoret, 451 F.3d at 149, citing Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004). Generally, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Demoret, 451 F.3d at 149, citing Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002). In addition, the plaintiff must demonstrate that the harassment occurred because of his membership in a protected class, here because of his race. See Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001).

In analyzing a hostile work environment claim, the Court must look at the record as a whole and assess the totality of the circumstances. See Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001). This analysis should include an examination of factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). In addition, if the victim does not subjectively perceive the

environment to be abusive, the conduct has not actually altered the conditions of the victim's employment.  Harris, 510 U.S. at 21-22.

In the instant case, plaintiffs allegations do not establish that the plaintiff's workplace was "objectively hostile."  See Demoret, 451 F.3d at 149.   First, as discussed earlier, there is no evidence that the failure to promote plaintiff was based on racially discriminatory motives.  Second, even if there was an issue of fact as to whether Calandrella used a racial slur in conversation with Boniello, one isolated incident does not create a workplace that is "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of...employment were therby altered." Alfano, 294 F.3d at 373; see also Demoret, 451 F.3d at 149.  Third, the plaintiff has admitted that he has no basis in personal knowledge or fact to support his accusation that Calandrella fought with another employee after using a racial slur.  See Patterson, 375 F.3d at 219 (finding that affidavit's hearsay assertion is insufficient to create a genuine issue for trial).  Fourth, there is no evidence that Calandrella's statement that plaintiff would "never be promoted" is based on plaintiff's race, and not on other permissible considerations.  And fifth, the Kibbler affidavit's two examples of racial comments made by Calandrella are based on Kibbler's own interaction with Calandrella, and not the plaintiff's. Plaintiff had no contemporaneous experience or knowledge of these incidents, and thus he cannot prove that they caused him to subjectively see his work environment as hostile.  In sum, plaintiff has not set forth sufficient evidence from which a reasonable jury could conclude that he was subject to a hostile work environment. Accordingly, I recommend that summary judgment on this claim be granted.

**3. Section 1981 Claim**

Plaintiff also asserts a claim under 42 U.S.C. § 1981, which "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as

employment." Patterson v. County of Oneida, 375 F.3d 206, 224 (2d Cir. 2004) (internal citation omitted). The Supreme Court has found, however, that Section 1981 does not provide an independent federal cause of action for damages against state actors. Jett v. Dallas Independent School Dist., 491 U.S. 701, 731-33 (1989); see also Patterson, 375 F.3d at 225. "Thus, to prevail on his claim for damages against [a state actor], [plaintiff] must show that the violation of his 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of Monell and subsequent cases." Jett, 491 U.S. at 735-36.

The plaintiff sues the defendant under Section 1981 as a state actor, arguing that the municipality should be liable because defendant Calandrella was a final decisionmaker for the state when he failed to promote the plaintiff. (Pl.'s Memo. in Supp. of Summ. J. 16, citing Pembaur, 475 U.S. at 483-84). In fact, the plaintiff uses the same facts and assertions for his Section 1981 claim as he does for his Section 1983 claim. (Id.) For both claims, the plaintiff must show that the defendant's violations were caused by a "custom or policy" under Monell. See Jett, 491 U.S. at 735-36. The standards applicable to plaintiff's 1981 claim are identical to his Section 1983 claim, and thus I will analyze them contemporaneously.

**4. Section 1983**

Plaintiff brings a Fourteenth Amendment equal protection claim under Section 1983, alleging that the defendants' employment actions were the result of unlawful racial discrimination. Plaintiff's Section 1983 claim rests solely on Calandrella's decision to deny him the Assistant Chief Track Officer position.[5] (See Pl.'s Memo. in Opp'n to Summ. J. 16-18). Thus, I will only discuss defendant's liability

---

[5]Plaintiff does not assert in any of his submissions that the failure to promote him to the Infrastructure of Electrical positions were the result of a custom or policy of discrimination under Section 1983. (See Pl.'s Memo. in Opp'n to Summ. J. 16-18). In fact, plaintiff only contests Calandrella's actions, and Calandrella was only responsible for the Track Officer

under Section 1983 for Calandrella's failure to promote plaintiff to the Assistant Chief Track Officer position.

## A. Municipal Liability Under Section 1983

Section 1983 provides that any person who acts under color of state law and thereby causes a person to be deprived of their federally protected rights will be civilly liable to the injured party. See 42 U.S.C. § 1983; see also Monell v. Dep't of Social Services of the City of New York, 436 U.S. 658, 658 (1978). To succeed under Section 1983, a plaintiff must show that (1) the defendant acted "under color of state law" and (2) as a result of the defendants' actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998). Municipalities and local governments can be sued under Section 1983, but the statute does not provide a cause of action on the basis of respondeat superior. See Monell, 436 U.S. at 691 ("a municipality cannot be held liable solely because it employs a tortfeasor"); Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 738 (1989). Therefore, a municipality can only be held liable under Section 1983 if the plaintiff proves that the violation was committed pursuant to a "policy, statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officer." Patterson, 375 F.3d at 226, citing Jett, 491 U.S. at 733-36. As the Supreme Court emphasized, "locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of...those officials whose acts may fairly be said to be those of the municipality." Monell, 436 U.S. at 694.

To show policy or custom, the plaintiff need not identify an express municipal rule or regulation. Patterson, 375 F.3d at 226. The plaintiff may establish a municipal policy or custom by proving that

_____

decision, and not the Infrastructure or Electrical Officer decisions. (See Def.'s 56.1 Stmt. ¶¶ 42, 72, 76, 90).

a final policymaker engaged in racial discrimination.  <u>Pembaur</u>, 475 U.S. at 483.  Whether a particular official has "final decision-making authority" is a question of state law; the challenged action must have been taken pursuant to a policy adopted by the official responsible under state law for making policy in that area of the city's business.  <u>Id.</u> at 482-83.  "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official– even a policymaking official– has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."  <u>Pembaur</u>, 475 U.S. at 481-82.  "[I]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from <u>respondeat superior</u> liability."  <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 126 (1988).

In defining a final policymaker in <u>Pembaur</u>, the Supreme Court's footnoted example is expositive in this case:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability....Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. <u>Pembaur</u>, 475 U.S. at 484, n. 12.

In this Circuit, the plaintiff bears the burden of establishing as a matter of law that the conduct of a given official represents official policy.  <u>See</u> <u>Jeffes v. Barnes</u>, 208 F.3d 49, 57-58 (2d Cir. 2000).

After careful review of the record, I find that plaintiff has failed to establish that Calandrella was a final policymaker under New York Law.  Plaintiff bases his argument on the fact that Calandrella was the final decisionmaker in denying him the Assistant Chief Track Officer position. The plaintiff notes that the person on the interview committee vested with the authority to select the applicant was the officer to whom the title reported, which in this case was Calandrella.  (Pl.'s Memo.

in Supp. of Summ. J. 17). Plaintiff claims that NYCTA is liable because "Calandrella - who headed the unit responsible for the construction and maintenance of all railway tracks in the most complex subway network on earth - was the official responsible for making final policy with respect to conduct challenged, that is, the decision to hire DellaMonica over Everson." (Pl.'s Memo. in Supp. of Summ. J. 18). As the Supreme Court noted, however, the fact that Calandrella has the discretion to hire and fire employees is not dispositive as to whether he was a final policymaker (see Pembaur, 475 U.S. at 484, n. 12) and it is the plaintiff's burden to show the court that he was. Jeffes, 208 F.3d at 57-58. Plaintiff has offered no evidence that Calandrella was responsible for making employment policy for the State of New York. Therefore, plaintiff has failed to prove that the employment decision was a state action, and thus I recommend that defendants' motion for summary judgment as to plaintiff's Section 1983, and Section 1981, claims be granted.

## III. CONCLUSION

For the foregoing reasons, I recommend that the defendants' motion for summary judgment be denied as to the plaintiff's retaliation claim, but granted as to the plaintiff's discrimination, hostile work environment, Section 1981 and Section 1983 claims.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal any judgment entered by the District Court's in reliance on this Report and Recommendation. See 28 U.S.C. § 636(b)(1) (2005); Fed. R. Civ. P. 72, 6(a), 6(e).

SO ORDERED.


Dated: December 29, 2006
       Brooklyn, New York

_____/s/_____
Joan M. Azrack
United States Magistrate Judge