UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- X
                                                :

BENJAMIN EVERSON,               :

                                   :

                       Plaintiff,   :       **MEMORANDUM AND ORDER**

                                   :

        - against -          :

                                   :       1:02-cv-1121-ENV-JMA

NEW YORK CITY TRANSIT    :

AUTHORITY and THOMAS     :

CALANDRELLA,              :

                                   :

                   Defendants.  :

                                   :
-------------------------------------------------- X

VITALIANO, D.J.

## Procedural History

On February 19, 2002, plaintiff Benjamin Everson ("Everson") brought this action

against his former employer, the New York City Transit Authority ("Transit Authority"), and his

former supervisor, Thomas Calandrella ("Calandrella"), alleging various violations of Title VII

of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the New York State

Human Rights Law, N.Y. Exec. Law § 290 et seq., the New York City Human Rights Law, N.Y.

City Admin. Code § 8-107 et seq., and 42 U.S.C. §§ 1981, 1983, 1985 and 1986.  The complaint

alleges that defendants failed to promote Everson due to his race, subjected him to a hostile work

environment, and retaliated against him for filing a discrimination complaint.  On May 1, 2002,

defendants moved to dismiss portions of the complaint.  By Memorandum and Order dated

August 12, 2002, District Judge I. Leo Glasser granted the motion in part and denied it in part.

Everson v. New York City Trans. Auth., 216 F. Supp. 2d 71 (2002).  Specifically, Judge Glasser

dismissed Everson's conspiracy claims, punitive damage claim, and his initial untimely failure to

promote claims.  Id. at 81.

On September 9, 2004, this case was transferred to District Judge Dora L. Irizarry, who was newly appointed to the federal bench.  On January 28, 2005, defendants moved for summary judgment on Everson's remaining claims, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  On April 6, 2006, Judge Irizarry referred defendants' motion to Magistrate Judge Joan M. Azrack for a Report and Recommendation.  On April 11, 2006, the case was transferred to this Court, who had then been newly appointed to the federal bench.  On December 29, 2006, Magistrate Judge Azrack issued a Report and Recommendation ("R & R").  Both Everson and defendants filed objections on January 16, 2007.

## Magistrate Judge's Report and Recommendation

Defendants moved to dismiss Everson's Title VII claims because he had not initiated this lawsuit within 90 days of receiving a "right-to-sue" letter from the EEOC.  See 42 U.S.C. § 2000e-5(f)(1).  At his deposition, Everson had denied ever receiving the letter.  Magistrate Judge Azrack found, citing Sherlock v. Montefiore Med. Ctr., 84 F.3d 522, 526 (2d Cir. 1996), that Everson's testimony was sufficient to create a genuine issue of material fact as to whether he had actually received the letter.  It was thus recommended that summary judgment not be granted on this ground.  Defendants have not objected to this recommendation.

It was also recommended that the Court grant summary judgment to defendants on Everson's failure to promote claims relating to the positions of Assistant Chief Infrastructure Officer, Chief Infrastructure Officer, and Assistant Chief Electrical Officer.  Judge Azrack wrote that, although Everson had made a *prima facie* showing of discrimination, defendants had offered a legitimate, nondiscriminatory reason for not promoting him to each of the positions and

that "the record contains not a shred of other evidence demonstrating the racial animus of the hiring decisionmakers . . . or a history of discrimination in hiring" at the Transit Authority.  R & R at 18.  As such, the R & R concludes that the record does not contain evidence that would allow a reasonable juror to find that any of these failures to promote Everson were based on illegal racial discrimination.  It was thus recommended that the Court grant defendants' motion for summary judgment on these claims.  Plaintiff has not objected to this recommendation.

Magistrate Judge Azrack also recommended that the Court dismiss Everson's failure to promote claim relating to the position of Assistant Chief Track Officer.  Judge Azrack found, again, that Everson had offered a *prima facie* case and that defendants had put forth a legitimate, nondiscriminatory reason for the adverse hiring decision – someone else had interviewed better. The R & R finds it to be significant that the hiring decision-maker had promoted African-Americans in the past and that Everson was ranked fifth out of six by an interview committee which included two African-Americans.  However, unlike the other failure to promote claims, Everson put forth some evidence of discriminatory intent, in particular, evidence of racist remarks by the hiring decision-maker, defendant Calandrella.  Judge Azrack concluded, however, that the stray remarks attributed to Calandrella over a 15-year period were remote and "simply not enough for the plaintiff to establish that Calandrella's explanations were pretext for racial discrimination."  R & R at 24.  It was thus recommended that the Court grant defendants' summary judgment motion with regard to this claim as well.  Plaintiff has objected to this recommendation.

Magistrate Judge Azrack recommended that the Court dismiss Everson's Title VII claims brought against Calandrella in an individual capacity.  See Wrighten v. Glowski, 232 F.3d 119,

120 (2d Cir. 2000) (per curiam).  Plaintiff has not objected to this recommendation.

The R & R deals separately with each of six alleged instances of retaliation and concludes that three would be actionable as stand-alone claims of retaliation, specifically, Everson's claims that defendants retaliated by: (i) giving him inaccurate evaluations for 1999 and 2000; (ii) reducing the vehicles assigned to his workspace over a two-year period; and (iii) refusing to reassign a staff analyst to him after March 2000.  Defendants object and contend that this Court should grant them summary judgment on Everson's retaliation claim.

Finally, Magistrate Judge Azrack recommended that the Court grant defendants summary judgment with regard to plaintiff's hostile work environment claim as well as his failure to promote claims brought against the Transit Authority pursuant to 42 U.S.C. §§ 1981 and 1983. Plaintiff has not objected to these recommendations.

## Plaintiff's Objection[1]

Everson objects to Magistrate Judge Azrack's recommendation that this Court grant the Transit Authority summary judgment on his Title VII claim that stems from defendants' failure to promote him to the position of Assistant Chief Track Officer.  Everson argues, in short, that he has put forth sufficient evidence to raise a genuine issue of material fact as to whether

---

[1]  In objecting to the R & R, both parties have submitted evidence that was not before Magistrate Judge Azrack.  Everson has submitted an additional affidavit, and defendants have submitted evidence relating to Everson's pay history.  The Court will not consider the newly-submitted evidence.  Discovery closed long ago, and Magistrate Judge Azrack has obviously put substantial effort into preparing a 40-page R & R, which is thorough and thoughtful.  The practice of considering additional evidence after the issuance of a R & R can make the entire referral process a wasteful one and, accordingly, this Court will not ordinarily exercise its discretion to consider such materials, especially when no explanation is given for their late submission.  See Glover v. New York City Trans. Auth., No. 03-cv-1140, 2006 WL 3083495, at *1 (E.D.N.Y. Oct. 20, 2006).  "Proceedings before the magistrate judge are not a trial run, after which litigants should feel free to add 'to the record in bits and pieces depending upon the rulings or recommendation they receive[ ].'"  Flynn v. Mark Contracting Corp., No. 01-cv-8227, 2004 WL 1859789, at *1 (E.D.N.Y. Jul. 23, 2004) (quoting Hynes v. Squillace, 143 F.3d 653, 656 (2d Cir. 1998)) (alteration in original).

defendants' stated reason for failing to promote him was pretext for illegal racial discrimination. Explaining the basis of his objection, Everson states that "[t]he facts presented regarding the issue of Calandrella's animus is not to be evaluated in a test tube, but must be considered in the context of the totality of the circumstances." Pl.'s Objection, at 8. He adds that the R & R over-relies on evidence that Calandrella had promoted African-Americans in the past, a fact that he claims is insignificant given that Calandrella had to promote some minority employees to reach "diversity management goals." As indicated above, Everson does not object to any of Judge Azrack's other recommendations.

### Defendants' Objections

Defendants object to Magistrate Judge Azrack's recommendation that the Court deny them summary judgment on Everson's retaliation claim. Defendants contend that Everson has made no showing of retaliatory animus or that the alleged retaliatory acts were even out of the ordinary. For example, defendants argue that plaintiff has made no showing that his post-complaint evaluations of "good" in 1999 and 2000 were inconsistent with the majority of his prior evaluations throughout the 1990s. Defendants add that "[i]solating the actions alleged to have occurred after his protected activity from the totality of Plaintiff's allegations regarding retaliation distorts the consistency of his experience both before and after his protected activity." Defs.' Objections, at 2. Defendants also point to the remote nature of the alleged retaliatory acts, both in terms of time and Transit Authority employees involved. Lastly, defendants claim that there is an "absence of any non-speculative evidence of materially adverse consequences [stemming] from the alleged retaliatory actions." Defs.' Objections, at 2. Defendants do not object to any of Judge Azrack's other recommendations.

## Standard of Review

When a magistrate judge is "assigned without consent of the parties to hear a pretrial matter dispositive of a claim or defense of a party . . . [t]he magistrate judge shall enter into the record a recommendation for disposition of the matter, including proposed findings of fact when appropriate." Fed. R. Civ. P. 72(b). In reviewing such a R & R, a district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). However, two standards apply. See Urena v. New York, 160 F. Supp. 2d 606, 609-10 (S.D.N.Y. 2001). Unobjected to findings of the R & R may be adopted so long as they are not clearly erroneous. Tsabbar v. Eason, No. 04-cv-10215, 2006 WL 3755178, at *2 (S.D.N.Y. Dec. 21, 2006); Knoll v. Equinox Fitness Clubs, No. 02-cv-9120, 2006 WL 2998754, at *1 (S.D.N.Y. Oct. 20, 2006). Findings that are timely objected to require a *de novo* determination by the district judge. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1); United States v. Raddatz, 447 U.S. 667, 674, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). The *de novo* standard requires that the district judge make an "independent determination of a controversy that accords no deference to any prior resolution of the same controversy." Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc., 51 F. Supp. 2d 457, 466 (S.D.N.Y. 1999) (quoting Raddatz, 447 U.S. at 690 (Stewart, J., dissenting)).

## Facts Underlying Plaintiff's Failure to Promote Claim

Everson is an African-American male who spent his entire career with the Transit Authority's track division, gradually working his way through its ranks. The Transit Authority hired Everson in 1970 as a track worker. Seven years later, Everson was promoted to foreman, a position in which he supervised between six and eight other track workers. In the mid-1980s,

6

Everson received a series of promotions: in March of 1984 to Assistant Supervisor, in September of 1984 to Deputy Superintendent, and in June of 1986 to Superintendent. As Superintendent, Everson's duties expanded to include managerial functions, like staffing, disciplinary procedures, quality control, and budget reports.

In April of 1992, the Transit Authority again promoted Everson, this time to the position of General Superintendent, where he oversaw between 125 and 220 employees involved in track maintenance work. In this position, Everson was responsible for productivity, budgetary, and personnel objectives.

In September of 1998, Everson applied for the position of Assistant Chief Track Officer of Subway Maintenance of Way, a position in which he would report directly to the Chief Track Officer of the Transit Authority's entire track division, defendant Calandrella. Defendants concede that, at the Transit Authority, "[t]he usual promotion progression is from General Superintendent to Assistant Chief and Assistant Chief to Chief." (Defs.' 56.1 Stmt. ¶ 94.) The application process for the Assistant Chief Track Officer position was an open one, meaning that the Transit Authority posted a job vacancy notice, required the submission of materials, and conducted interviews. According to the Transit Authority, selection to the position was based on a candidate's resume, letters of application, experience, skills, education, and personal interviews. The job vacancy notice stated that "baccalaureate degree in civil, mechanical or electrical engineering, business administration or a related field is desirable. Twelve years of experience with track maintenance and construction, eight years of which must have been in a supervisory or managerial capacity, are required." The Transit Authority's human resources department screened applicants for the position and forwarded six of the 12 applicants to an

interview panel of four transit workers, which included Calandrella and two black individuals. The decision-maker on the panel was, consistent with Transit Authority practice, the person to whom the applicant would be reporting – Calandrella. Transit Authority practice was also for this person to ask the bulk of the questions at the interview. At Everson's interview, the interviewers asked questions relating to safety, discipline, budgetary concerns, and overall management.

After a round of interviews, Ralph DellaMonica was selected for the Assistant Chief position. Like Everson, DellaMonica had worked his way through the ranks at the Transit Authority. He began his career in 1980 as a track worker. In 1985, the Transit Authority promoted DellaMonica to the position of Maintenance Supervisor, and in 1986, he was promoted to Maintenance Supervisor – Level Two, a position in which he supervised approximately 50 to 60 track workers. He was again promoted in October of 1987 to Deputy Superintendent of Track and Track Construction. In this position, he oversaw approximately 70 to 80 track workers and 8 to 12 supervisors. The Transit Authority then promoted him to Superintendent in 1992 and General Superintendent in 1996. Prior to being hired as Assistant Chief, DellaMonica's last performance review was "good."

The Transit Authority's internal applicant flow data sheet shows that Everson was ranked fifth out of the six individuals interviewed; only a Hispanic male was rated lower. DellaMonica was ranked first. In an internal memorandum written the day after he selected DellaMonica, Calandrella explained:

> All of the candidates interviewed possessed sufficient experience in
> the management and performance of track maintenance activities.

> Mr. DellaMonica was selected because he presented his ideas, during the interview, in the clearest and most comprehensive way, gave an excellent "required presentation" on the subject of "Track Maintenance in a Time of Reduced Budgets and Manpower" and answered all questions that came up during the interview, clearly and thoughtfully.
>
> He seemed the ideal candidate for the position in the "long run" because of his planning and business skills. Out of a group of good candidates for the position, he was clearly the best choice.

(Drinan Decl., Exh. 6.) Everson claims that he was decidedly more qualified than DellaMonica for the position and that the contemporaneously written memorandum was nothing more than pretext for Calandrella's true racially-motivated aim.

In support, Everson points out that he had a decade more experience than DellaMonica, and further, that his experience was directly relevant to the position for which both applied. It is uncontested that in his 32 years of employment at the Transit Authority, Everson was never late to work, never took a single sick day, and maintained an unblemished attendance record.

Further, Everson has proffered the affidavit of James Kibbler, a Transit Authority employee between 1968 and 1992 who, at the time of his retirement, held the title of Superintendent – Capital Program. Kibbler states that Everson "was one of the most efficient and capable employees" with whom he had ever worked. (Kibbler Aff. ¶ 4.) Kibbler adds that "Everson was widely regarded as being one of the most dedicated, skilled, and conscientious employees in the DOT, with uncanny knowledge of the department and track systems in general, and an unparalleled work ethic." (Id. ¶ 4.)

Everson has also proffered the affidavit of Edward Dixon, a Transit Authority employee between 1967 and 1998 who, before his retirement, held the position that Everson sought. Dixon

was familiar with both DellaMonica and Everson, whom he had directly supervised for nearly 10 years. Dixon opines generally that Everson "was among the most dedicated, responsible, motivated, and highly-skilled employees in the DOT." (Dixon Aff. ¶ 6.) According to Dixon, "Everson was renowned for his ability to solve problems quickly under adverse circumstances." (Id. ¶ 6.) Dixon adds that "Everson consistently surpassed departmental performance and production objections [sic] by and through his extraordinary leadership capabilities." (Id. ¶ 6.) Dixon concludes that "[w]hile I would describe Mr. DellaMonica as a good employee, it is my firm opinion, based on my experience in the DOT, that Mr. Everson was better suited and was otherwise more qualified to fill my former position." (Id. ¶ 9.)

Consistent with this proof, Everson claims that, though he and DellaMonica were both General Superintendents when they applied for the Assistant Chief position, his experience was substantially more relevant to the subject Assistant Chief position. The Assistant Chief Track Officer of Subway Maintenance of Way is, as the title suggests, a position related mostly to track maintenance. (Id. ¶ 12.) Track maintenance involves the upkeep of existing tracks and generally takes place while subways are running within the system. Track construction, on the other hand, entails the laying of new tracks in the subway system and is performed when subway lines are completely shut down. (Id. ¶ 12-13.) According to Dixon, "track maintenance work generally requires a greater degree of efficiency, precision, decisiveness and quick analytical ability." (Id. ¶ 13.) The majority of DellaMonica's prior experience was in track construction; he had spent less than a year and a half in track maintenance, whereas Everson had spent over ten years in track maintenance. (Id. ¶ 15.) Given the relevant experience of the two workers, Dixon concludes that Everson's qualifications "appreciably outweighed" DellaMonica's and that the

Transit Authority's hiring decision was "puzzling and somewhat disturbing."  (Id. ¶ 16-17.)

Regarding his own work record, Everson has also put forth portions of the deposition testimony of Samuel Rumala, who at one time was employed in data collection and analysis at the Transit Authority.[2]  Rumala testified that he collected performance-based data related to measures such as "rail installation, tie installation, plate installation, emergency response and lubrication."  (Rumala Dep. at 30.)  Rumala concluded that "[d]uring the course of his productivity and production work, [Everson's] performance was always much better than that of the other generals and his data was very accurate."  (Id. at 30.)  Everson's performance reviews for the periods preceding his application were positive.  For 1996, Everson had received an overall rating of good, and for 1997, Everson had received an overall rating of excellent, the highest rating possible.

As to discriminatory intent, Everson proffered evidence to show that Calandrella harbored racial animus toward him.  Everson claims that he had, on one occasion in 1984, overheard Calandrella use the word "nigger" when speaking to another co-worker.  James Kibbler's affidavit also speaks to Calandrella's use of racially-charged language.  Kibbler worked directly with Calandrella for at least 15 years.  His affidavit states generally that, throughout his years of employment, he "knew Calandrella to harbor animosity and hostility toward Black Transit employees, and **on several occasions**, [he] personally heard Calandrella make patently offensive, racist remarks toward other Black employees."  (Kibbler Aff. ¶ 7, emphasis added.)  In the affidavit, Kibbler gives two specific examples.  On one unspecified

_____

    [2]  Samuel Rumala, a black Nigerian male, also brought a race discrimination claim against defendants in 2002.  See Rumala v. New York City Trans. Auth., No. 02-cv-3828, 2005 WL 2076596 (E.D.N.Y. Aug. 26, 2005).  Defendants were granted summary judgment in that case.  Id. at *18.

occasion, the affidavit states that Calandrella called a black employee a gorilla, and on another

unspecified occasion, Calandrella had told a black employee to "shut his black mouth." (Id. ¶ 8.)

Defendants have put forth evidence in an attempt to rebut the claim that Calandrella

harbored racial animus. Specifically, Calandrella asserted at his deposition that, during a Transit

Authority reorganization in 1996 when he was given the opportunity to select four Assistant

Chiefs, he had chosen two black employees. (Calandrella Dep. at 18-27.) Everson questions

this contention, however, by claiming that one of the black employees already held a position

that was the functional equivalent of the newly created Assistant Chief position and, thus, was

not "promoted" or "selected" by Calandrella. (Everson Dep. at 59.) Everson claims further that

the other black employee was promoted because he was a "relaxed and non-confrontational"

person whom Calandrella "felt he could easily manipulate and control." (Everson Aff. ¶ 21.)

Aside from the Assistant Chief promotions, it is uncontested that Calandrella promoted at least

three other black employees, though the record does not show the positions to which they were

promoted or whether any competing candidates were white.

**Facts Underlying Everson's Retaliation Claim**

Everson filed a discrimination complaint with the Transit Authority's Equal Employment

Opportunity Office in January of 1999. He subsequently filed an EEOC charge of discrimination

in March of 1999 and this lawsuit in February of 2002. Everson alleges that his supervisors

retaliated against him for bringing complaints by: (i) giving him inaccurate evaluations in 1999

and 2000; (ii) reducing the number of vehicles assigned to his division over a two-year period;

(iii) reassigning and failing to replace his staff members; (iv) transferring him to a workplace

farther from his home in December 2001; (v) refusing to speak to him at the workplace after he

filed his complaints; and (vi) not praising him for his emergency work after the events of September 11, 2001. Magistrate Judge Azrack recommended that the Court deny defendants' summary judgment motion on this claim.

For 1999 and 2000, Everson received overall performance reviews of "good" on a scale of four performance levels: "excellent," "good," "marginal," and "poor." Approximately 25% of all such evaluations fell into the "excellent" category. (Cronin Dep. at 11.) At his deposition, Everson admitted that, even before 1999, he had received overall evaluations of "good." (Everson Dep. at 62.) He specifically recalled receiving a "good" rating in 1996 and "excellent" ratings in 1997 and 1998. He could not recall precisely, though, how many "good" and "excellent" ratings he had received in years prior to 1996. (Id. at 62-63.) Everson's Rule 56.1 statement does assert, however, that his performance evaluations "were never below the level of 'good,' and sometimes reached the level of 'excellent.'" (Pl.'s 56.1 Stmt. ¶ 59.)

The review and appeals process at the Transit Authority for a manager's performance evaluation was, at least for the years 1999 and 2000, as follows: (i) a supervisor completed a year-end evaluation; (ii) a manager could then meet with that supervisor for a step-one review at which the manager would present his case of why the evaluation should have been different; (iii) the reviewing supervisor would then provide a response and decision on whether the overall rating should be changed; (iv) an unsatisfied manager could then seek a similar second-level review from the division head, or his designee; (v) if still unsatisfied, the manager could take a third-level appeal to the head of the department, who would then assign a three-person panel to hear the appeal and render a final decision. (Cronin Dep. at 6-7.)

In 2000, Everson appealed his overall rating of "good" for 1999, first, to his direct

supervisor, Joseph Caiozzo, who sustained the rating, and then to Calandrella, who delegated the appeal to William Cronin, a Senior Director of Administration. Cronin testified at his deposition that Calandrella wanted an "independent eye" to look at the appeal. (Id. at 8.) Cronin also sustained the good rating. Everson received another good rating for 2000, which he appealed unsuccessfully to Caiozzo and Calandrella, who again designated Cronin to hear the appeal. In appealing his rating for 2000, Everson took a third-level appeal to Joe Hoffman, the Transit Authority's head of subways. Hoffman assigned the appeal to a three-person board, which sustained Everson's "good" rating.

Defendants claim that Everson's rating was not "excellent" for 1999 and 2000 because of his substantial budget overruns in those years. One of Everson's supervisors, Joseph Caiozzo, testified that Everson claimed his budget allocation was too low and routinely overran the budgets that were set for his department. (Caiozzo Dep. at 41-42.) In a June 29, 2000 memorandum rejecting Everson's appeal of his 1999 rating, Caiozzo wrote that Everson was over budget "by 4,090 non-reimbursable hours (budgeted 8,201 actual 12,291) and 16,817 reimbursable hours (budgeted 13,255 actual 30,069) in 1999 overtime." (Drinan Decl., Exh. 13.) In a September 19, 2000 memorandum rejecting Everson's second-level appeal, Cronin raised the same concerns regarding budget and added that "[f]urther troubling to me is your lack of awareness of exactly how much over the overtime your unit was. In our meeting, you asserted that you were only 774 hours over your nonreimbursable overtime budget. In fact, you were over 4,090 hours over." (Drinan Decl., Exh. 15.)

Everson, not surprisingly, argues a linkage between his alleged deficiencies and the alleged retaliatory acts. Everson points specifically to Caiozzo's decisions relating to the

allocation of staffing and resources to his department.  First, Everson claims that his supervisors never filled a clerical position that became vacant in 1997.  (Everson Dep. at 76-77.)  It was Everson's understanding that, rather than replace the clerk, the Transit Authority assigned a night worker to DellaMonica.  Everson also claims that his supervisors took away one of his staff management analysts without explanation in March 2000, which reduced his total number of staff analysts from "five or six" to "four or five."  (Id. at 63.)  Finally, Everson testified that his supervisors took away two vans from his division, reducing his total number "10 or 11" to "8 or 9."  (Id. at 72.)  The first van was taken away in "May to the latter part of 1999" and the second about a year later in 2000.  (Id. at 63, 70.)  The vans were used as safety escorts for wide load tractor-trailers going to and from job sites.  (Id. at 61.)  Everson oversaw about 19 or 20 tractor-trailers.  (Id. at 72.)  Plaintiff asserts that these business decisions were part of the Transit Authority's deliberate scheme to retaliate against him for filing complaints of discrimination, and, to the extent there were shortcomings in Everson's performance, they were attributable in part to retaliatory sabotage.

## Summary Judgment Standard

Under the Federal Rules of Civil Procedure, a court must grant summary judgment upon finding, based on the pleadings, depositions, interrogatory answers, admissions, and affidavits that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d

Cir. 2004).  In determining whether the moving party has met this burden, a court must construe all evidence in a light most favorable to the nonmoving party, resolving all ambiguities and inferences in its favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original); Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 90 (2d Cir. 2002).  Material facts are those, which given the substantive law, might affect the suit's outcome.  Anderson, 477 U.S. at 248.

If the moving party makes a *prima facie* showing that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and put forth "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002).  In so doing, the nonmoving party may not rely on conclusory allegations or speculation.  Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citing D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998)); Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").  Thus, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (quoting Matsushita, 475 U.S. at 586).  Nonetheless, the nonmoving party need not make a

compelling showing; it need merely show that reasonable minds could differ as to the import of the proffered evidence. R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997).

"In an employment discrimination case when . . . the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998). Plaintiffs are usually in the position of having to rely on the weight of circumstantial evidence to show discriminatory intent because "smoking gun" evidence is typically unavailable. Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991); Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1112 (2d Cir. 1988). Accordingly, given that an intent inquiry is fact-specific and requires close attention to the evidence and credibility of witnesses, summary judgment is often inappropriate in employment discrimination cases. Rosen, 928 F.2d at 533.

### Failure to Promote Claim

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Court assesses a failure to promote claim by applying the three-step burden-shifting approach enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996).

Under the McDonnell Douglas framework, a plaintiff must first offer sufficient evidence to establish a *prima facie* case. McDonnell Douglas, 411 U.S. at 802. To do so, the plaintiff must show that: (i) he is a member of a protected class; (ii) he was qualified for the position; (iii)

he was denied the position; and (iv) the circumstances of the adverse employment action give rise to an inference of discrimination. Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003); Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 (2d Cir. 2000). A plaintiff's burden in presenting *prima facie* evidence of discrimination is *de minimis*, Bush v. Fordham Univ., 452 F. Supp. 2d 394, 407 (S.D.N.Y. 2006), and "[a]n inference of discrimination may arise . . . if the position was filled by someone not a member of plaintiff's protected class." Gomez v. Pellicone, 986 F. Supp. 220, 228 (S.D.N.Y. 1997) (citing McDonnell Douglas, 411 U.S. at 802). If the plaintiff can make this minimal showing, a rebuttable presumption of discrimination arises and the burden of production then shifts to the defendant to articulate a legitimate, clear, and specific nondiscriminatory reason for the employment decision. See Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995). The defendant's burden at this stage is, like the plaintiff's initial burden, not a demanding one. See Bickerstaff v. Vassar Coll., 196 F.3d 435, 446 (2d Cir. 1999).

If the defendant succeeds in articulating a legitimate nondiscriminatory reason, the burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the employer's given reason is merely pretext for what is truly a discriminatory purpose. Id. For a plaintiff to survive summary judgment at this final stage, "the court must conclude based on the factual record taken as a whole that a reasonably [sic] jury could find discrimination to have been at least a contributing factor in the employer's decision." Wolde-Meskel v. Argus Cmty., Inc., 99-cv-10112, 2001 WL 883648, at *5 (S.D.N.Y. Aug. 7, 2001) (citations omitted); Bickerstaff, 196 F.3d at 448 ("[T]he question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances."). The McDonnell Douglas method guides this Court; yet, it is a flexible guide and should not be

applied mechanistically as a "rigid ritual."  See Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1112 (2d Cir. 1988); see also  Lapsley v. Columbia Univ., 999 F. Supp. 506, 513-16 (S.D.N.Y. 1998).

At this point, the sole remaining issue on Everson's failure to promote claim is whether Everson has put forth sufficient evidence upon which a reasonable jury could find that defendants' stated reason for failing to promote him was pretext for racial discrimination. Defendants contend that Everson was qualified for the Assistant Chief position, but that the person ultimately hired, DellaMonica, interviewed better.  To support their contention that race had nothing to do with their decision, defendants point out: (i) Calandrella explained his decision in a contemporaneously written memorandum; (ii) an interview committee consisting of two African-American employees rated Everson fifth out of six interviewed applicants; and (iii) while Everson has shown no history of discrimination in hiring and/or promotion by defendants, Calandrella had, in fact, promoted African-Americans in the past.

In objecting to Magistrate Judge Azrack's recommendation, Everson contends that a genuine issue of material fact remains as to whether race played a role.  This Court agrees. Although the evidence offered by Everson to that effect is hardly overwhelming, he has put forth enough to survive summary judgment.  Viewing the evidence in its totality, and not in a piece-by-piece fashion, the Court cannot say that a trial in this matter would be a futility. A jury should be given the chance to assess the evidence.

To start, there is powerful evidence in the record relating to Everson's superior experience-based qualifications for the Assistant Chief Track Officer position.  Most compelling is the affidavit of Everson's former supervisor, Edward Dixon, who himself had held the position

that Everson sought. Dixon explains why, in his opinion, Everson was much more qualified than DellaMonica. Dixon concludes that Everson's qualifications "appreciably outweighed" DellaMonica's, and that the Transit Authority's hiring decision was "puzzling and somewhat disturbing." (Dixon Aff. ¶ 16-17.) Having knowledge of both workers, the duties entailed in the position of Assistant Chief Track Officer, and the ordinary protocols of advancement at the Transit Authority, Dixon's testimony could carry much appropriate weight with a jury regarding the relative qualifications of the two employees vying for the position. This Court agrees with Magistrate Judge Azrack that Everson's claim of superior qualifications would not be enough on its own to overcome defendants' summary judgment motion. See Byrnie v. Town of Cromwell, 243 F.3d 93, 103 (2d Cir. 2003). But, when evidence of a substantial disparity in qualifications – which Everson's former supervisor testifies to here – is offered in conjunction with other relevant evidence, the trier of fact may appropriately glean discriminatory intent. See Holmes v. Brentwood Union Free Sch. Dist., No. 03-cv-1084, 2006 WL 1581434, at *6 (E.D.N.Y. May 25, 2006) ("somewhat superior" qualifications are probative of pretext); Zakre v. Norddeutsche Landesbank Girozentrale, 396 F. Supp. 2d 483, 509 n.2 (S.D.N.Y. 2005). Significantly, to be sure, the disparity of qualifications is not the only evidence that Everson has offered.

Also in the record is Everson's own testimony that, on one occasion, he had heard the hiring decision-maker use the word "nigger." Everson's testimony is not uncorroborated. He also offers the affidavit of another former high-ranking Transit Authority employee who had heard the hiring decision-maker make similarly vile remarks. "While it is true that the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination . . . when 'other indicia of discrimination are properly presented, the remarks can no longer be

20

deemed stray, and the jury has a right to conclude that they bear a more ominous significance.'" Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) (quoting Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir.1998)); Zakre, 396 F. Supp. 2d at 508.

This Court concludes, therefore, that evidence of Everson's superior qualifications taken together with evidence that the hiring decision-maker had made racist remarks is enough for this claim to survive summary judgment. The fact that other former senior Transit Authority employees have corroborated Everson's testimony on both points is of great significance. This is not a case of a plaintiff making unsupported allegations. On balance, then, a reasonable jury could conclude that impermissible considerations of race played a factor in defendants' failure to promote Everson. As such, a jury should be given the opportunity to assess the evidence. The motion of defendants for summary judgment on this claim must be denied.

### Retaliation Claim

Under Title VII, it is unlawful for an employer to "discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Such retaliation claims are also analyzed under the McDonnell Douglas burden-shifting framework. Coffey v. Dobbs Int'l Servs., Inc., 170 F.3d 323, 326 (2d Cir. 1999). In this context, a plaintiff may present a *prima facie* case by showing: (i) he engaged in protected activity; (ii) his employer was aware of the activity; (iii) the employer took an adverse action; and (iv) a causal connection exists between the alleged adverse action and protected activity. Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 608 (2d Cir. 2006). Plaintiff's burden at this stage is *de minimis*. See Donato v. Plainview-Old Bethpage Central Sch. Dist., 96 F.3d 623, 634 (2d Cir. 1996). A

plaintiff may show a causal connection between his protected act and the employer's alleged retaliatory action either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (citing Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir.1993)); DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987). Once the plaintiff puts forth a *prima facie* case, the burden shifting discussed earlier ensues. Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).

The Court has reviewed Magistrate Judge Azrack's R & R and agrees that Everson has put forth a *prima facie* case of retaliation and that a genuine issue of material fact remains as to this claim. Further, defendants are reminded that a moving party has the initial burden of showing the appropriateness of summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Defendants motion papers only passingly mention several allegations that are at the heart of Everson's retaliation claim. Defendants did not even attempt to put forth a legitimate explanation for taking away key staff and vehicles from Everson after he brought his complaint. Accordingly, the R & R states that "[i]n considering the limited evidence in the record, I simply cannot recommend granting summary judgment as to these two retaliation claims." R & R at 31. Having reviewed the submissions, this Court agrees.[3] In conclusion, then, the Court finds the R & R to be well-reasoned on Everson's

---

[3] For the reasons stated in note 1, *supra*, the Court will not now consider newly submitted materials that were not before Magistrate Judge Azrack.

retaliation claim and, as such, summary judgment is denied on this claim.

## Other Claims

The Court has thoroughly reviewed the record and the recommendations of Magistrate Judge Azrack to which neither party has objected. None of those recommendations are clearly erroneous, and they are thus adopted in full.

The Court also notes that defendants' motion papers did not seek summary judgment on Everson's failure to promote claim brought against Calandrella individually pursuant to 42 U.S.C. §§ 1981 and 1983. Accordingly, the R & R does not address this claim. It thus survives summary judgment, see Rumala v. New York City Trans. Auth., No. 02-cv-3828, 2005 WL 2076596, at *11 (E.D.N.Y. Aug. 26, 2005), to the same extent that Everson's failure to promote claim survives against the Transit Authority.

## CONCLUSION

For the foregoing reasons, Magistrate Judge Azrack's R & R is adopted in part. Defendants' motion for summary judgment is granted on Everson's hostile work environment claim against defendants, on all of his claims against the Transit Authority brought pursuant to 42 U.S.C. §§ 1981 and 1983, and on his failure to promote claims, with the exception of the claim relating to the failure of the Transit Authority and Calandrella to promote him to the position of Assistant Chief Track Officer of Subway Maintenance of Way. Summary judgment is denied with respect to Everson's retaliation claim.

The parties shall submit a joint pre-trial order by March 1, 2007. A pre-trial conference will be held on March 9, 2007 at 3:00 p.m. Jury selection and trial in this matter will commence

on March 26, 2007 at 10:00 a.m. in Courtroom 6 of the United States Courthouse in Brooklyn,

New York.

**SO ORDERED.**

Dated: Brooklyn, New York
      February 16, 2007

                                              / s / Eric N. Vitaliano
                                              ERIC N. VITALIANO
                                              United States District Judge